**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Mr. and Mrs. J., as Next Friends of their son, B.J.,<br>Plaintiffs, | |
| v. | Civil Action No. 25-cv-742 |
| Westport Board of Education,<br>Defendant. | May 8, 2025 |

**COMPLAINT**

**INTRODUCTION**

1. Mr. and Mrs. J. (Parents), as Next Friends of their son B.J., bring this action against Westport Board of Education (Board) under Title II of the Americans with Disabilities Act, 42 U.S.C.12131, *et seq*. (ADA) and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Section 504).

2. B.J. is an eleven-year-old child whose school records document that he has a severe allergy to mold, which substantially limits the major life activity of breathing and the major bodily function of respiration. He also has diagnoses of Obsessive Compulsive Disorder (OCD) and Anxiety, which substantially limit the major life activities of thinking and concentrating. He therefore enjoys the protections of the ADA and Section 504.

3. On August 12, 2024, Parents filed a due process hearing request asserting claims under Section 504 and the ADA, as well as the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq*. (IDEA). Parents sought relief for the denial of an appropriate education for the 2022-2023, 2023-2024, and 2024-2025 school years.

4.  On April 1, 2025, a Connecticut Special Education Hearing Officer (SEHO) dismissed the IDEA claim because she found that B.J. did not need special education and was therefore not IDEA-eligible. Citing *Doe v. Westport Board of Education*, 609 F. Supp. 3d 75, 84 (D. Conn. 2020), the SEHO declined to consider the 504/ADA claims for lack of jurisdiction. *See* Exhibit 1, Hearing Officer Decision (*Dec.*), *Student v. Westport Bd. of Educ.*, Case No. 25-0077, at 1 n.2 (April 1, 2005).

5.  With this appeal, Parents seek to pursue B.J.'s claims under Section 504 and the ADA for the Board's years-long failure to provide reasonable accommodations for his disability and resultant damages.

**PARTIES**

6.  B.J. lives with his Parents within the area served by the Board.

7.  The Board is a recipient of federal funds subject to Section 504, 29 U.S.C. § 794(b)(2)(B) and a "public entity" subject to Title II of the ADA. 42 U.S.C. § 12131(1).

**JURISDICTION AND VENUE**

8.  This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

9.  Plaintiffs have exhausted administrative remedies as required by 20 U.S.C. § 1415(*l*). *See Doe v. Canton Bd. of Educ.*, No. 3:21-cv-904-OAW, 2024 U.S. Dist. LEXIS 78346, at *38 (D. Conn. Apr. 30, 2024). The SEHO issued her decision on April 1, 2025 and Parents are filing this Complaint within forty-five days of that decision. *See P.M.B. v. Ridgefield Bd. of Educ.*, 944 F.3d 743, 746 n.1 (2d Cir. 2019).

10. Venue in the District of Connecticut is appropriate because the events or omissions giving rise to the claim occurred within this District. 28 U.S.C. § 1391.

**STATUTORY BACKGROUND**

11. Because the standards for liability under the ADA and Section 504 are nearly identical, federal courts routinely consider the merits of such claims together. *Brooklyn Ctr. for Independence of the Disabled v. Metro. Transp. Auth.*, 11 F.4th 55, 61 (2d Cir. 2021).

12. The ADA, enacted in 1990 "is the Federal Government's most recent and extensive endeavor to address discrimination against persons with disabilities." *Olmstead v. L.C.*, 527 U.S. 581, 589 n.2 (1999). The ADA "is intended 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Olmstead,* 527 U.S. at 589.

13. An individual has a disability as defined by the ADA and Section 504 if he has a physical or mental impairment that substantially limits one or more major life activities. In determining whether an individual is entitled to the protections of the ADA:

   a. Major life activities include breathing and the operation of any major bodily function, including the respiratory function. 42 U.S.C. § 12102(2)(A), (B).

   b. The definition of disability "shall be construed in favor of broad coverage . . . to the maximum extent permitted by" the ADA. 42 U.S.C. § 12102(4)(A).

   c. "The term 'substantially limits; shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008 [the ADAAA]." 42 U.S.C. § 12102(4)(B). The ADAAA includes the finding that individuals with disabilities continually face, in addition to outright intentional exclusion, the discriminatory effects of architectural barriers and failure to make modifications to existing facilities and that individuals with disabilities are severely disadvantaged in myriad ways, including educationally. 42 U.S.C. § 12101(a)(5), (6). The ADAAA's purpose is, *inter alia*, "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

   d. The principal purpose of the ADAAA was to overrule prior Supreme Court decisions with narrow interpretation of what constitutes an ADA-qualifying disability. Congress made clear that the substantial limitation requirement in the definition of disability is not an exacting one. *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 92 (2d Cir. 2021).

14. There is no requirement that students be disabled in the major life activity of learning to be entitled to the protections of Section 504 and the ADA. *See Weixel v. Bd. of Educ. of New York*, 287 F.3d 138, 147 (2d Cir. 2002). It is sufficient to demonstrate that a student is limited in *any* major life activity because of his or her disabling condition. *Id.*

15. A public entity discriminates against an individual with a disability when it fails, as a practical matter, to provide meaningful access to its benefits, programs, or services. *Brooklyn Ctr.*, 11 F.4th at 61-62; *accord Henrietta D. v. Bloomberg*, 331 F.3d 261, 282 (2d Cir. 2003).

16. An "accommodation must overcome structural impediments . . . that limit access to programs, services, and activities." *Brooklyn Ctr.*, 11 F.4th at 62 (quoting *Wright v. N.Y. Dep't of Corr.*, 831 F.3d 64, 73 (2d Cir. 2016).

17. Under current controlling case law,[1] a public school district is liable to a student for denial of reasonable accommodations in violation of Section 504 or the ADA if it acts with "deliberate or reckless indifference." *Yzaguirre v. KIPP N.Y.C. Pub. Charter Sch.*,2025 U.S. Dist. LEXIS 23745, at *22 (S.D.N.Y. Feb. 7, 2025). Reckless indifference means that the Board acted to B.J.'s detriment in the face of a perceived risk that its actions would violate federal law. *D.C. ex rel. E.B. v. New York City Dep't of Educ.*, 940 F. Supp. 2d 494, 518 (S.D.N.Y. 2013) (reasonable juror could conclude that failure to recommend an alternative placement or explain how school could accommodate student's allergy could amount to reckless indifference sufficient to impose liability).

18. A party proving a violation of Section 504 and/or Title II of the ADA is entitled to damages "traditionally available in suits for breach of contract." *Cummings v. Premier Rehab*

[1] The question of the intent standard for Section 504/ADA violations in cases involving public school children is currently before the Supreme Court and was argued on April 28, 2025. *See A.J.T. v. Osseo Area Schs.*, 96 F.4th 1058 (8th Cir. 2024), *cert. granted*, 145 S. Ct. 1122 (2025).

*Keller, P.L.L.C.*, 596 U.S. 212, 230 (2022). Such relief includes "expectation damages," which are meant to provide the plaintiff "the benefit of the bargain that he or she made by awarding a sum of money that will place [him or her] in as good a position as he or she would have been in had the contract been performed." 24 Williston on Contracts § 64.3 (4th ed. 2022).

19. A party's expectation damages are measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform, that can be established with reasonable certainty. Restatement (Second) of Contracts §§ 347, 352.

**FACTS**

20. B.J. attended Long Lots Elementary School through the end of third grade (2022-2023).

21. For the 2023-2024 and 2024-2025 school years, Parents enrolled him in a private school that could provide accommodations for his disabilities that the Board was unwilling to offer.

22. Westport is a shoreline community, subject to frequent flooding and resultant mold. At a July 13, 2021 Board meeting, a report was presented summarizing areas of concern at Long Lots, including aged roof and windows and an outdated HVAC system.

23. By school year leading up to B.J.'s last year in the District, documented incident reports by year of water incursion, health-related issues by students or staff, water-stained tiles, musty smells/odors, and mold were: 2023-2024: 58 (as of May 2023); 2022-2023: 31; 2021-2022: 20; 2020-2021: 9; 2019-2020: 9.

24. In March 2021, an allergist diagnosed B.J. with a mold allergy. Parents notified B.J.'s teacher, explaining that they had taken him to the doctor because he was experiencing

congestion, headaches, bloody noses, and stomach aches. Extensive testing revealed that B.J. was solely allergic to mold. Parents asked the teacher about mold and humidity in the classroom.

25. Parents requested documents from the Board pursuant to a Freedom of Information Act (FOIA) request. Those documents revealed years of neglect regarding humidity levels, old windows, moisture incursion, and elevated levels of mold testing, especially in B.J.'s classroom. Parents requested accommodations for B.J.

26. Parents attended numerous meetings, beginning in May d, related to the problems with mold and unsafe air quality at LLS.

27. The Board convened a Section 504 meeting on May 21, 2021. As a result of his allergies, B.J. experienced symptoms of congestion, headaches, nose bleeds, cough, and angioedema. Board personnel acknowledged that B.J. was limited in the major life activity of breathing and did not dispute that his allergies affected his respiratory function.

28. The Board failed to consider the impact of B.J.'s impairment without the potential impact of mitigating measures, including medication, placement of his desk, and use of a dehumidifier in the classroom.

29. The Board provided B.J. with an Individualized Health Care Plan (IHCP) instead of a Section 504 plan. The IHCP acknowledged B.J.'s allergy to mold and resultant impact on his respiratory system and ability to breathe. The IHCP provided for mitigating measures, including that B.J.'s desk would not be placed within six feet of an air vent or window, his classroom would contain a dehumidifier, and B.J. and Parents would communicate with the school nurse related to his symptoms.

30. On September 10, 2021, Mrs. J.  sent an email to B.J.'s teacher regarding his symptoms of headaches and congestion. She was concerned that air quality at Long Lots was impacting B.J.

physically. During the 2021-2022 school year, B.J.'s teacher accommodated him by locating him next to the door for the entire year. B.J. remained relatively healthy and had a good year.

31. B.J.'s third grade year (2022-2023) was not as successful.

32. During the 2022-2023 school year, Mrs. J. spoke frequently with B.J.'s classroom teacher regarding his allergy symptoms. She also explained that he had developed OCD and anxiety as a result of the exacerbation of his allergies in school.

33. After B.J. experienced two bloody noses in the classroom, there was a walkthrough of the room. Participants in the walkthrough noted moisture had come in through the 1950's windows and onto the wooden windowsills. The custodial team resealed the windows and painted the sills with a mold prevention paint.

34. During the last three months of the fall 2022 semester, B.J. came home on four separate occasions with swollen lips due to allergies.

35. On January 9, 2023, Parents reminded B.J.'s teacher that he needed to sit as far away from the window/vent as possible and the dehumidifier needed to be on at all times.

36. On January 20, 2023, Mrs. J. sent an email to Board personnel documenting Parents' continued concerns. She explained that rainy days were particularly problematic, resulting in allergy-related symptoms that interfered with B.J.'s after-school activities.

37. On January 30, 2023, Parents wrote to request, as an accommodation for B.J.'s allergies, that he be placed at another elementary school operated by the Board for fourth and fifth grades.

38. At a February 3, 2023 meeting, Board personnel led Parents to believe that the Board would not transfer B.J. to another District elementary school that would limit his exposure to mold unless he had a 504 plan.

39. In early 2023, Parents secured documentation from B.J.'s medical providers as follows:

a. On January 25, 2023, Danelle Khorsandi, APRN, from B.J.'s allergist's office, wrote: "B.J. is a patient in our office with a known mold allergy. He was retested recently and continues to test positive for mold and with an increased level of positivity. He continues to experience frequent [signs] of nasal congestion, which will be exacerbated with continued mold exposure. Measures to help control allergen exposure are use of antihistamines, air purifiers, dehumidifier and being as far from known growth as possible. It is my understanding that these measures are already in place and he continues to experience symptoms. Prolonged exposure will continue to be detrimental to his health. I feel the best option would be if he could be moved to an environment free of mold exposure." *See* Exhibit 2.

b. In a letter dated February 16, 2023, B.J.'s pediatrician, Lauren F. Allison, M.D. wrote: "B.J. is a patient of mine. He has a mold allergy as documented by repeated allergy testing. He has frequent symptoms of chronic nasal congestion, chronic cough, nose bleeds, and angioedema. These symptoms can be attributed to ongoing mold exposure at levels that the patient cannot tolerate. If mitigation efforts have not resulted in improvement or relief of his symptoms then the levels of mold in the environment are still unacceptable for B.J. He has developed health-related anxiety as a result of these chronic symptoms. B.J. exhibits worries that interfere with daily living, panic regarding getting sick and not feeling well, and poor self-esteem. It is my recommendation that B.J. be provided a 504 plan to accommodate his anxiety and mold allergy. Careful consideration needs to be given around the current school placement as he continues to suffer medically from exposure to mold at school. It would benefit him physically and mentally to be in a different environment without chronic mold exposure." *See* Exhibit 3.

c. In a letter dated March 2, 2023, Karen J. Hotchkiss, M.D., a child psychiatrist wrote that she was treating B.J. for OCD and Generalized Anxiety Disorder, moderate to severe. She stated, "Over the past months, B.J.'s persistent worries, panic over getting sick, resistance to going to school, sleep difficulties and obsessive-compulsive symptoms have worsened as a result of the effects on his physical health from the chronic mold exposure. It is my understanding that a 504 meeting is to be held next week. I strongly recommend accommodations be granted around his current school placement. B.J. would clearly benefit from an alternate school placement free from chronic mold exposure with improvement in his mental health and physical conditions." *See* Exhibit 4.

d. On March 6, 2023, Danielle Khorsandi, APRN wrote an additional letter, stating that B.J. returned for a follow-up visit earlier in the year due to a new symptoms of swollen lips, which also accompany nasal congestion, headache, dry skin, and nosebleeds. Because measures to help control allergen exposure at Long Lots had not been efficacious, she wrote: "At this stage, with new symptom progression, I feel the best option would be if he could be moved to an environment free of mold exposure." *See* Exhibit 5.

40. On March 10, 2023, the Board held a Pupil Personnel Team (PPT) meeting to determine

B.J.'s eligibility. The recording of the PPT meeting documents the following:

    a.    Parents read aloud a letter requesting that B.J. be placed at another elementary school for fourth and fifth grades. They explained that, secondary to his allergies, B.J. had developed debilitating health-related anxiety and OCD which interfered with his daily living and was leading to school-avoidant behavior and plummeting confidence and self-esteem.

    b.    Board personnel indicated that they did not contest B.J.'s medical diagnoses of OCD, anxiety, and mold allergy. These conditions indisputably meet the definition of a "physical or mental impairment."

    c.    In deciding that B.J. was ineligible, the standard the Board applied was whether B.J. was completely "unable to perform" a major life activity. This is not the correct standard for 504/ADA eligibility, which requires substantial limitation, not a complete inability to perform.

    d.    The Board misapplied the 504/ADA eligibility criteria because Board personnel failed to recognize that B.J.'s physical and mental impairments substantially limited the major life activities of breathing, concentrating, and thinking. The PPT also failed to recognize that B.J.'s physical impairment causes a substantial limitation on the major bodily function of respiration.

    e.    The Board made it clear at the March 10, 2023 meeting that it was denying B.J.'s eligibility for a Section 504 plan.

41. Parents understood from Board personnel that the Board would not transfer B.J. to

another public elementary school unless he had a Section 504 plan. Therefore, on March 20,

2023, counsel for Parents wrote to counsel for the Board explaining that Parents would be

placing B.J. at a private school and seeking reimbursement from the Board.

42. On May 3, 2023, Parents received written notice from the Board that it was denying

Parents' request for a Section 504 plan because B.J. did not, according to the PPT, have an

impairment that substantially limited a major life activity.

43. During the months of May and June, 2023, B.J.'s physical and mental symptoms

continued unabated.

44. Board personnel acted with deliberate and/or reckless indifference to B.J.'s federally protected rights when they refused to consider transferring him to a building which would be accessible to him, given his documented and uncontested mold allergies. This is especially true when they continued to deny the request to transfer after B.J. began to develop OCD and anxiety-related symptoms secondary to the failure to accommodate his allergies.

45. Parents funded B.J.'s placement at Fairfield Country Day School (FCDS) for the 2023-2024 and 2024-2025 school years.

46. During the 2023-2024 and 2024-2025 school years at FCDS, B.J. enjoyed access to his educational programming that he had not been afforded at Long Lots Elementary.

**COUNT I**
**SECTION 504 OF THE REHABILITATION ACT**
**29 U.S.C. § 794**

47. Plaintiffs incorporate the foregoing paragraphs fully by reference herein.

48. The Board has violated Section 504, 29 U.S.C. § 794 and 34 C.F.R. § 104.4 by:

   a. denying B.J. the opportunity to participate in and benefit from federally assisted educational services, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(i);

   b. affording B.J. an opportunity to participate in or benefit from public education that is not equal to that afforded others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(ii);

   c. providing B.J. with public education that is not as effective as that provided to others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(iii); and

   d. limiting B.J.'s enjoyment of the right and opportunity to receive a public education, in violation of 34 C.F.R. § 104.4(b)(1)(vii).

49. The Board acted with deliberate and/or reckless indifference to B.J.'s federally protected rights under Section 504. *See D.C. ex rel. E.B. v. New York City Dep't of Educ.*, 940 F. Supp. 2d 494, 518 (S.D.N.Y. 2013).

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Board and an order granting the following relief:

(1) An award of compensatory damages, in the form of expectation damages, for the costs incurred by Plaintiffs for tuition for and transportation to a private school for the 2023-2024 and 2024-2025 school years;

(2) An award of reasonable attorney's fees and costs; and

(3) Such other relief as is just and appropriate.

**COUNT II**
**TITLE II OF THE ADA**
**42 U.S.C. § 12132**

50. Plaintiffs incorporate the foregoing paragraphs fully by reference herein.

51. The Board has violated B.J.'s rights secured by the ADA, 42 U.S.C. § 12132, *et seq.* and 28 C.F.R. § 35.130 by:

    a. excluding B.J. from participation in and denying him the benefits of the Board's services, programs, or activities, in violation of 28 C.F.R. § 35.130(a);

    b. subjecting B.J. to discrimination, in violation of 28 C.F.R. § 35.130(a);

    c. denying B.J. the opportunity to participate in or benefit from the Board's aids, benefits, or services, in violation of 28 C.F.R. § 35.130(b)(1)(i);

    d. denying B.J. the opportunity to participate in and benefit from aids, benefits and services on a basis equal with that afforded others, in violation of 28 C.F.R. § 35.130(b)(1)(ii);

    e. providing B.J. with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others, in violation of 28 C.F.R. § 35.130(b)(1)(iii);

    f. otherwise limiting B.J. in the enjoyment of rights, privileges, advantages, or opportunities enjoyed by others receiving the Board's aid, benefit, or service, in violation of 28 C.F.R. § 35.130(b)(1)(vii); and

    g. refusing to make reasonable modifications in policies, practices, or procedures

when the modifications are necessary to avoid discrimination against B.J., in violation of 28 C.F.R. § 35.130(b)(7)(i).

52. The Board acted with deliberate and/or reckless indifference to B.J.'s federally protected rights under the ADA. *See D.C. ex rel. E.B. v. New York City Dep't of Educ.*, 940 F. Supp. 2d 494, 518 (S.D.N.Y. 2013).

**WHEREFORE**, Plaintiffs demand judgment in their favor and against the Board and an order granting the following relief:

(1) An award of compensatory damages, in the form of expectation damages, for the costs incurred by Plaintiffs for tuition for and transportation to a private school for the 2023-2024 and 2024-2025 school years;

(2) An award of reasonable attorney's fees and costs; and

(3) Such other relief as is just and appropriate.

The Plaintiffs by

Dated: May 8, 2025

*<u>/s/ Catherine Merino Reisman</u>* <u>ct30597</u>
Catherine Merino Reisman ct30597
Reisman Gran Zuba LLP
923 Haddonfield Road, Suite 300
Cherry Hill NJ 08002
856.354.0071
catherine@rgz.law

Jennifer D. Laviano ct17601
Laviano & Gagne, LLC
76 Route 37 South
Sherman CT 06784
860.350.4757
lavlawjen@gmail.com

*Exhibit 1*

April 1, 2025 Case No. 25-0077

**STATE OF CONNECTICUT**
**DEPARTMENT OF EDUCATION**

**Student v. Westport Board of Education**

**FINAL DECISION AND ORDER**
**GRANTING BOARD'S MOTION TO DISMISS**

This Hearing Request was originally brought on August 12, 2024 concerning a child who was a fifth grader who has been identified as a student in need of accommodations under Section 504 of the Rehabilitation Act or 1973 ("Section 504") and parentally placed at a private school. [1] The original Hearing Request consisted of chronologies of correspondences between parents and parent counsel with school administrators and school counsel from 2021 to 2023 concerning mold, headaches, nosebleeds and air quality and meetings under Section 504. The Hearing Officer conducted a Prehearing Conference on August 30, 2024 in which the issues (or lack of special education issues implicating jurisdiction) for the hearing were discussed.[2]

On September 13, 2024, the Board filed a Sufficiency Challenge pursuant to 34 CFR §508(b). On September 18, 2024, the Hearing Officer granted the Sufficiency Challenge. The Hearing Officer ordered the Parents to file an Amended Complaint within ten (10) business days. The amended complaint should specifically actions the Board did or did not take with respect to the Individuals with Disabilities Education Act ("IDEA") including the failure to provide a "free appropriate public education" ("FAPE") and include facts about the Board's action or lack of actions that led to a failure in the provision of "special education" to the student as the term is defined by 34 CFR §300.39, including what "specially designed instruction" was necessary to meet the unique needs of the student for the student to receive FAPE.

The Parents filed an Amended Complaint on October 21, 2024. The Amended Complaint generally alleged that Student qualified for special education. The Amended Complaint alleged that the school district failed to identify the student as a "Student with a Disability in need of Special Education" under the IDEA but did not otherwise specifically make allegations about what type of special education was necessary for Student to receive a FAPE. The parents failed to comply with the Hearing Officer's order to include factual allegations.

The Hearing Officer conducted a second Prehearing Conference on October 29, 2024. The Board filed a motion to dismiss the Amended Complaint on November 15, 2024. The Board argued that Parents failed to comply with the Hearing Officer's Order. The Parents filed a Memorandum in Opposition on December 2, 2024.

The Hearing Officer held oral argument on the Board's Motion to Dismiss on February 5, 2025. At the oral argument Parent counsel claimed that the student had in fact received special education instruction at the private school he attended. Over the objection of the Board, the Hearing Officer deferred ruling on the Board's motion to dismiss and ordered the parents the

[1] The Hearing Request incorrectly uses the term "unilateral placement" to suggest that the District is under an obligation to reimburse the parents for their unilateral decision to parentally place their child who had not been identified as being eligible for IDEA services. See 34 CFR §300.148 (a)

[2] In Connecticut, IDEA Hearing Officers' jurisdiction is limited to IDEA claims and they may only consider Section 504/ADA issues as is necessary to resolve those claims." *Doe v. Westport Bd. of Educ.*, 609 F. Supp. 3d 75, 84 (D. Conn. 2020)

Exhibit 1

amend the Amended Complaint within ten (10) calendar days to state what "special education" might Student have qualified for when he was in the public school. The Board was allowed ten (10) days thereafter to file a response or to renew its motion to dismiss.

The Parents filed a Second Amended Complaint dated February 18, 2025 and the Board filed a motion to dismiss Parents' Second Amended Complaint on March 10, 2025. Having reviewed the Second Amended Complaint and the federal and state regulations, the Hearing Officer concludes that the Second Amended Complaint is insufficient in alleging that that Student qualifies as a Child with a Student with a Disability under the IDEA in need of "special education" and now grants the Board's Motion to Dismiss.

The Second Amended Complaint makes a single allegation post facto that the student received some "specialized instruction" at the private school he had been attending in an effort to make the case that the student is a "Child with a Disability" who should have been identified as needing "special education" and whose private school tuition was a "unilateral placement" that should be paid by the school district. It should be noted that there were no other allegations added to the second amendment to support the claim that the student's alleged suspected disability interfered with his academic performance in school. [3] While the complaint makes many allegations about parental concerns about healthy classroom environment at Westport Public Schools during Student's time at Long Lots Elementary, the complaint is devoid of information about the student's lack of educational attainment. In fact, it seems despite Student's disability of "Other Health Impairment" may have required student's grades were superior at the private school he attended. His grades there were in the 90s to 100 range.

Turning to the issue "specially designed instruction", the Second Amended Complaint in paragraph zzz states that the student received:

> "individualized Executive Functioning instruction, which assisted him in understanding how to plan for and break down short and long term assignments, organizing his materials, time management and task initiation and completion. This instruction also provides [student] with strategies for focus and attention. Being these skills is particularly important for student who have an anxiety disorder, as does [Student] who can interfere with his ability to function in school. In addition to executive functioning instruction, [Student] has received instruction in social and emotional learning, including self-awareness, social skills, emotional regulation and effective decision making in order to learn and the instruction and environment at FCDS has been so successful that [Student] is ready to return to the public schools for the 2025-2026 school year."

Whether or not organizing skills or social skills training is contemplated as "special education" or "related services" is a threshold question that must be decided. If such instruction can be categorized as "specially designed instruction" under 34 CFR §300.39, then it would be considered "special education". If such "individualized executive functioning instruction" and

[3] The only allegations about the student's academic performance in complaint shows that he was capable and indeed above an above average or superior student, at least at the private school.

"social emotional Learning" can be categorized as "related services", then such training, however helpful, cannot be considered "special education" or "specially designed instruction" within the meaning of 34 CFR §300.39. [4] The framework of the federal regulations leaves to the state educational agencies to determine of what is specialized instruction and what is a related service. For example, while 34 CFR §300.39 (a)(2) includes speech and language instructional services as special education, the regulation defers to state agencies to determine what is special education and what is a "related service.

A review of the Connecticut IEP manual and a general review of the federal regulation at 34 CFR §300.39(a)(1) favors a conclusion that the "instruction" that the student was receiving was more "training" of the sort given by psychologists and coaches and not "special education" teachers that would normally be providing in a special education setting.

34 CFR §300.39 states that *specially designed instruction* means **adapting**, as appropriate to the needs of an eligible child under this part, the ***content, methodology***, or ***delivery of instruction*** (i) to address the unique needs of the child that *result from the child's disability*; and (ii) to ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children. .

Similarly, the Connecticut IEP Manual in Section 7 defines "Special Education Service and Related Services" as follows:

> A special education service, sometimes referred to as "specially designed instruction," is an instructional service (for example, language arts instruction or math instruction) ***delivered by a certified teacher or someone under the direction of a certified teacher*** (for example, ***an instructional aide or paraprofessional***). Special Education Services can be delivered through a variety of methods and settings. [Emphasis supplied]

In the Connecticut IEP Manual, "Related services" includes " psychological services as well as "counseling services…. in schools… counseling and training ." See *Section 7, Connecticut IEP Manual 2022 Revised 2023*

Turning again the Second Amended Complaint, the student's instruction addresses his "emotional regulation" and "anxiety disorder" and helps with "executive functioning" and "initiation" and "time management". These techniques are more in line with psychological services than methodologies used by certified special education teachers in adapt delivery of math and English and reading to special students who are struggling with various disorders. The IDEA is designed to ensure that children with disabilities have access to FAPE tailored to their unique needs. This aligns with the requirement for access to the general education curriculum. A.R. v. Conn. State. Board of Ed., 5 F.4th 155 (2d. Cir. 2021) The Second Amended Complaint fails to provide allegations of grades such that the school district would have been aware that the

[4] (1)Special education means specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including – instruction in the classroom, in the home, in hospitals and institutions, and in other settings; (2) Special education includes each of the following, if services otherwise meets the requirements of paragraph(a)(1) of this section- (1) Speech-language pathology services or any other related service, if service is considered special education *rather than related service under State standards*; [emphasis supplied]..

April 1, 2025 Case No. 25-0077

student might have qualified as a Child with a Disability in need of special education to access the general education curriculum. The Board's motion to dismiss is GRANTED.

4

Exhibit 1

If the local or regional board of education or the unified school district responsible for providing special education for the student requiring special education does not take action on the findings or prescription of the hearing officer within fifteen days after receipt thereof, the State Board of Education shall take appropriate action to enforce the findings or prescription of the hearing officer.

Appeals from the hearing decision of the hearing officer may be made to state or federal court by either party in accordance with the provisions of Section 4-183, Connecticut General Statutes, and Title 20, United States Code 1415(i)(2)(A).

Hearing Officer Signature

Sylvia Ho

Hearing Officer Name in Print

signpage.doc (ho disk)
4/1/04

*Exhibit 2*



ALLERGY & ASTHMA CARE OF FAIRFIELD COUNTY, LLC
Adult & Pediatric Allergy & Asthma
55 Walls Drive • Suite 105 • Fairfield, CT 06824 • 203-259-7070 • Fax 203-254-7402
35 Corporate Drive • Suite 1115 • Trumbull, CT • 06611 • 203-445-1960
www.allergyandasthmacare.com

*Kenneth Backman, MD • Katherine Bloom, MD • Sara Dever, MD*
*Jillian Ross, APRN • Danielle Khorsandi, APRN*

01-25-2023

Patient B███ F J███

DOB ███
DOV: 01-18-2023

To Whom It May Concern,
B███ is a patient in our office with a known mold allergy. He was retested recently and continues to test positive for mold and with an increased level of positivity. He continues to experience frequent sx of nasal congesiton, which will be exacerbated with continued mold exposure. Measures to help control allergen exposure are use of antihistamines, air purifiers, dehumidifier and being as far from known growth as possible. It is my understanding that these measures are already in place and he contnues to experience symptoms Prolonged exposure will continue to be detrimental to his health. I feel the best option would be if he could be moved to an environment free of mold exposure.
Thank you for your time and attention to this matter.

Sincerely yours,

Danielle Khorsandi APRN

Electronically signed by: Electronically signed by Danielle Khorsandi, APRN 01-25-2023 9:28 a.m.

Exhibit 2

# *Exhibit 3*



# Willows Pediatric Group, P.C.

1563 Post Road East • Westport, Connecticut 06880 • (203) 319-3939
Fax Administrative (203) 319-3955 • Fax Clinical (203) 319-3966 • www.willowspediatrics.com

Date: February 16, 2023

Patient: B████ J███

DOB: ██████████

To Whom It May Concern:

B████ J████ is a patient of mine. He has a mold allergy as documented by repeated allergy testing. He has frequent symptoms of chronic nasal congestion, chronic cough, nose bleeds, and angioedema. These symptoms can be attributed to ongoing mold exposure at levels that the patient cannot tolerate. If mitigation efforts have not resulted in improvement or relief of his symptoms then the levels of mold in the environment are still unacceptable for B████. He has developed health-related anxiety as a result of these chronic symptoms. B████ exhibits worries that interfere with daily living, panic regarding getting sick and not feeling well, and poor self-esteem. It is my recommendation that Bradley be provided a 504 plan to accommodate his anxiety and mold allergy. Careful consideration needs to be given around the current school placement as he continues to suffer medically from exposure to mold at school. It would benefit him physically and mentally to be in a different environment without chronic mold exposure.

Sincerely,

Lauren F. Allison MD

Lauren F. Allison, M.D. • Laura M. Marks, M.D. • Jeffrey A. Owens, M.D. • Rachel E. Sheiman, M.D.
Jonathan E. Sollinger, M.D. • Janet C. Woodward, M.D. • Susan M. Amster, PA-C
Heather A. Buccigross, PA-C • Sue Marie DeMelis Turotsy, PA-C

Exhibit 3

# *Exhibit 4*



B[redacted] J[redacted] 504

View Zoom Add Page Insert Table Chart Text Shape Media Comment Collaborate

Karen J. Hotchkiss, M.D.
Child and Adolescent Psychiatry
Adult Psychiatry
1 Turkey Hill Road South
Westport, CT 06880
203-240-3323
Medical License Number CT41422

March 2, 2023

Patient: B[redacted] J[redacted]
Date of Birth: [redacted]
Address: [redacted] [redacted]
Westport, CT 06880
School: Long Lots Elementary School

To: Long Lots Elementary School 504 Committee

B[redacted] J[redacted] is under my care and received an intensive psychiatric evaluation on February 14, 2023. He is diagnosed with Obsessive Compulsive Disorder and General Anxiety Disorder, moderate to severe. He also has a severe mold allergy as diagnosed with repeated allergy testing. He has frequent nosebleeds, nasal congestion, cough, and angioedema. These symptoms can be attributed to the mold that he is exposed to at school. These medical symptoms have significantly exacerbated his anxiety disorders. B[redacted] is now participating in cognitive behavioral therapy on a regular basis and is also being evaluated for the need of anxiety medication.

Over the past months, B[redacted]'s persistent worries, panic over getting sick, resistance to going to school, sleep difficulties and obsessive compulsive symptoms have worsened as a result of the effects on his physical health from the chronic mold exposure. It is my understanding that a 504 meeting is to be held next week. I strongly recommend accommodations be granted around his current school placement. B[redacted] would clearly benefit from an

Across America Da...

Exhibit 4



alternate school placement free from chronic mold exposure with improvement in his mental health and physical conditions.

If I can be of any further assistance, please don't hesitate in contacting me. Thank you in advance for your consideration in this matter.

Sincerely,

Karen J. Hotchkiss, M.D.
Child, Adolescent and Adult Psychiatrist

Exhibit 4

# *Exhibit 5*



**ALLERGY & ASTHMA CARE OF FAIRFIELD COUNTY, LLC**
Adult & Pediatric Allergy & Asthma
55 Walls Drive • Suite 105 • Fairfield, CT 06824 • 203-259-7070 • Fax 203-254-7402
35 Corporate Drive • Suite 1115 • Trumbull, CT • 06611 • 203-445-1960
www.allergyandasthmacare.com

***Kenneth Backman, MD • Katherine Bloom, MD • Sara Dever, MD***
***Jillian Ross, APRN • Danielle Khorsandi, APRN***

03-06-2023

Patient: B[redacted] F J[redacted]
DOB: [redacted]
DOV. 01-18-2023

To Whom It May Concern,
I would like to take the time to thank Dr. Weinberger for speaking with me in regards to B[redacted] J[redacted]. He returned for a follow-up office visit earlier this year due to new symptoms of swollen lips, which also accompany nasal congestion, headache, dry skin and nosebleeds. Testing was completed and he was found to be positive to mold. A 504 plan is to be put in place and accomodations be made to help with symptoms. As discussed previously, measures have been put into place in the school system to help reduce exposure, however he continues to experience symptoms as well as feelings of anxiety related to these symptoms and health concerns, which may be detrimental to his health. Measures to help control allergen exposure are use of antihistamines, air purifiers with HEPA filter, dehumidifier and being as far from known growth as possible. At this stage, with new symptom progression, I feel the best option would be if he could be moved to an environment free of mold exposure.

Thank you for your time and attention to this matter.

Sincerely yours,

Danielle Khorsandi APRN

Electronically signed by: Electronically signed by Danielle Khorsandi, APRN 03-06-2023 11:39 a.m.

Exhibit 5